Good morning, everyone. As I indicated on Monday, Judge Hardiman and I are pleased to be joined here on the panel by Judge Michael Shigaris from our circuit who hails from the state of New Jersey. So we're pleased to be with you this morning, and we'll call our Good morning, Your Honors. May it please the Court, my name is John Gaul. I'm one of the counsel for plaintiff's appellants, Christian Barriez and Montaniel Behar, V.D. I would like to introduce to the Court my colleagues, Ms. Philomena Dane and Mr. Christian Haas, who are with me this morning. My client is also Mr. Barriez, and the Courtroom is pleased to be here with me. I would, if the Court will indulge me, I would like very much to use the acronyms and abbreviations in the briefing to shorten the explanation. Some of the names are extended. I'd also like, if it please the Court, to reserve three minutes for rebuttal. That request will be granted. Thank you, Your Honor. If it please the Court, Mr. Titus and Ms. Shreve, the issue which this appeal presents is whether a shareholder of a corporation, Mr. Barriez in this case, can recover damages or losses that he suffered or misrepresentations made directly to him by Carnegie Mellon University to induce him to invest in government. Representations made directly to him to induce him to invest in government. We believe that this is the issue that this Court is being called upon to resolve. We believe the answer to that question is unmistakably yes. We respectfully request that the Court reverse the contrary decision of the Court below and amend the case thereof for further proceedings. The record in this case, to which Carnegie Mellon University is now bound by reason of an arbitration award against them in an arbitration proceeding that the Governor's has initiated. Well, of course, the District Court didn't rule on the collateral estoppel issue, right? The District Court did not rule on the collateral estoppel issue, did it? The District Court, I believe, Your Honor, assumed that we were correct with respect to collateral estoppel but did not attribute any significance to that in view of his analysis of an underlying issue. It is important because the arbitral record comprised part of the record in this case. The arbitral record establishes in the briefing ad nauseum displays that there were representations made both to Governors and to plaintiffs' affiliates about certain microwave technology. Representations were in their shortest form that it worked, that it was capable of and feasible for cracking complex hydrocarbons and transforming them into usable petroleum products. That representation was the basis upon which Carnegie Mellon in 1996 induced Governors to take an assignment of a contract for further development and commercialization of this supposed technology. Three years later, three years later, Carnegie Mellon made those same representations, identical in some respects, identical documents in some respects, delivered those same materials and made those same representations, that is, that this supposed technology worked to Mr. to invest $5 million in Governors for the purpose of further funding the development and commercialization of this. All right. Why don't you tell us, since your time is going here pretty quickly, why don't you tell us why the district court was wrong? The district court is wrong, Your Honor. The district court concluded that because there had been one set of misrepresentations, there could only be one set of damages. And therefore, because the arbitral award satisfied 100% the damages that Governors were seeking, there could be no further damages to plaintiffs' appellants other than, there could be no further damages to plaintiffs' appellants. The court below said that it didn't matter, in effect, that the same representations had been made to two people separately. But didn't the district court say that the reason why you couldn't recover was that the misrepresentations by Carnegie Mellon were not the proximate cause of your loss? Ah, that was a compounding of the court's original error, Your Honor. Both are equally wrong. The court below said, the court below said, one set of misrepresentations made to two people produced one injury that's been 100% satisfied. There's been a distribution or will be a distribution by Governors to the shareholders pro rata. If there's any shortfall, the district court said, if there's any shortfall to Mr. Barras, and there will be, that can't have been due to the misrepresentations because the misrepresentations will support only a single injury and a single damage award. That's at page 20 of the court's opinion below. One set of misrepresentations, same misrepresentations support one injury, one damage award. And because Governors got to the courthouse first and got the damage award, plaintiff's shortfall, so the court said, must have been due, as a matter of law, to something other than the misrepresentations that were made to him about the technology. And the court below said that that proximate cause is what plaintiff did not establish. That the shortfall was due to some other reason than the misrepresentations. Those are the two errors the court below made. The record is extensive. But why isn't the court correct on that? Because the damage and injury that my client suffered is different from the damage and injury that Governors suffered. It was based on the same misrepresentations, was it not? The misrepresentations, Your Honor, were made to two different people, separated in time by three years for entirely different purposes and produced exactly opposite injuries. The injury to Governors was the failure of consideration of the underlying contract. The failure of consideration of the underlying, complete failure of consideration of the underlying contract and the loss of the monies that Governors had invested pursuant to the original 1996 agreement. The injury and loss to my client was its investment in Governors' stock. In the earlier iteration of this case, Juarez won. The court, I believe, made exactly that point, exactly that point in absolving plaintiff's appellants from the obligation to arbitrate the claims along with Governors in the arbitration proceeding. The court separated that out at that point and said, we got different things going on here. The claims of Governors are based on the 1996 promotion and commercialization agreement. Mr. Juarez's claims relate to the 1999 decision to invest stock. Different claims, different analysis. Wouldn't your client have been better off if they'd stayed in that arbitration? I doubt it, Your Honor, because, well, in hindsight, Your Honor, we may have made a different decision. My client's interested in a jury trial. This is a horrendous fraud that was perpetrated here by Carnegie Mellon University completely at the other end of the spectrum from the wonderful reputation that fine scientific institution enjoys. My client wanted a jury trial for his rights, and he was entitled to that. And this court said he was in the earlier iteration of Juarez won. That's why we went to a jury. Is there a law of the case impact from our first decision, Juarez? I believe the law, I believe the issue in Juarez won is whether the claims arose out of the same event. Correct. And I believe the court, that is the law of the case now is that the claims do not arise out of the same set of operative facts because of, I'm using the word same set of operative facts, but the claims have a different basis. They are based on different events. They are based on different agreements, are they not? Yes, sir. Based on different agreements, different decisions, different purposes, different points in time, different people. The notion that the injury was the same, that there wasn't a separate injury and no separate right to damages, I believe, flies in the face of this court's decision, certainly the case that is the product of another panel of this court or a majority of another panel of this court in the age. That was a case in which four brothers, shareholders in a company, were allowed by the court to prosecute their claims separately based essentially on the same representations about the problem. There is no doubt here that the plaintiff's appellants would like to say whatever time remains here, sit down. There is no doubt that the distribution that will flow to all of the shareholders pro rata mitigates plaintiff's damages. Certainly the amount he can seek here will be diminished by whatever he gets from the arbitral award that represents his share. But that does not affect the underlying analysis or in any way dispel the notion that the cause of his loss, the whole $5 million loss, is the fact that he was misrepresented. He received misrepresentations about the technology. And the fact that the technology was valueless rendered his investment worth nothing in its entirety. Absolutely. In a footnote in your brief, you said you had advised the court as to whether distribution would be made and how much. Has anything happened that you can report to us? Go ahead. I hope there would have been a final distribution by now. There has not. We expect it imminently. To date, Mr. Juarez's pro rata share of the net proceeds of the arbitral award are approximately $2,100,000. We anticipate that he will receive in the final distribution another $150,000 or $200,000, which leaves a shortfall of approximately $2,700,000. And that is the money, that is the remainder of the $5 million loss he suffered. Does your client in this case have a punitive damages claim against CMU? He will have. The district court's ruling, the district court ruled on several motions and amendments before the arbitral award was made. We believe the impact of the arbitral award will cause the district judge to revisit some of the motions and amendments. One of the motions and amendments was that we were not entitled to recover CMU's damages. Other motions and amendments had to do with the economic loss doctrine, and we believe those decisions in view of the arbitral award are certainly known. And as a matter of law, we believe that the bond will look at those. Well, did the court rule on them? Yes, sir. And ruled against you, I take it? Yes, sir. We have a series of motions and amendments, a series of a couple of sentence orders denying or granting the motions and amendments. But those were, the court is well aware, those are preliminary only, unless the court evidences an intention that they be definitive, and no such intention is requested. All right, Mr. Gall, we'll hear back from you on that. Thank you. Mr. Yukaitis. Thank you, Your Honor. A little harder name than Mr. Gall, Mr. Yukaitis, and thank you, Your Honor. It's a pleasure, as always, to appear in front of this court, and it's an honor and pleasure certainly to represent CMU in this matter. I had a big outline here as to what I was going to say. I think I'll cut it short. I'll try to get to the point that the court was speaking. First of all, I think the opinion of Judge Schwab, a 24-page opinion, is well written, well reasoned, cites the sound Pennsylvania precedent, precedent of this court, applies that precedent to found facts, most of which were stipulated to between Mr. Gall and I, my friend Mr. Gall, I would say, and I, and is a sound decision. Secondly, I would say that the court's methodology is correct and that it went through a classic analysis, and I'll get to the point. One, it said we are a moving part. We raised an issue here. We said they don't have proximate cause on the two counts that remain. Proximate cause is an element. It then said, in turn, it said, now, plaintiff, you have the burden to bring forth evidence, bring forth convincing evidence as to why proximate cause exists. The court then wrote in its opinion, despite that opportunity, they presented no evidence to me at all on the issue of proximate cause. That's what Judge Schwab found. He also said, in turn, too, now, am I to decide this issue, and that's important, whether or not this is an issue for the court or for the jury. And he found, based upon sound Third Circuit precedent, that no, that is a decision that I have to make, that you all have said to him, you make the decision. So he was faced with that, and he made his decision. He looked at the facts. He said proximate cause is what? It's a little more different than but for cause. He said, what do you do? The Third Circuit has told me, and I have the cases in the brief, to look at that concept much more strictly. And the test is to be, is there a strong, direct nexus between the conduct here of CMU and the loss that's involved? I submit he used the correct methodology. Then he turned to what? The facts. How could that nexus not exist? How could it not exist? Under these facts. On these facts, we didn't see any way, Your Honor. And that comes right to my point, and I'll get right to our point. I'm the losing lawyer in the arbitration. Not very happy about that. I guess I've lost more important cases, but not many more important. We lost $6.9 million, basically, in that litigation. We were told by Mr. Unger to return the money, every bit of money, back to Governor. Now, as you recall, the finding, and this is a finding by stipulation, that Mr. Borges' money was always designated for one purpose and one purpose only. This project. It's not like a shareholder that says, Merck, here's my money. I'm buying stock. You want to develop this drug? Okay. You want to develop drug B? That's okay. He said, my money is to go for one purpose only, this project. Yeah, but what evidence other than that is there that that money was earmarked? Well, that's the complaint. It went to Governor. The complaint says that it was earmarked. 23.5% of the shares of Governor's in return for his $5 million investment. It was designated, Your Honor, first of all in the brief, or in the complaint, it says, Borges invested $5 million in the project, number one. Number two, in the briefs filed by Borges' counsel himself, they stated, this investment was made in order to fund the work being done by CMRI. Number three, I asked Mr. Borges at deposition specific questions on that. You recall saying that you felt he'd taken a risk. Correct. What? What was that risk? I invested $5 million in the project, not in Governor's. So he said, essentially, here's my pot of $5 million. But he didn't get 6.5 million shares in the project. He got 6.5 million shares in Governor's. But with the directive, Your Honor, that the money go directly to and be channeled into the project. So much so, Your Honor. What evidence is there in the record from Governor's that they accepted that stipulation in earmark? Well, in the record is the allegation and the assertion and the proven fact by deposition that his money actually was diverted. The question came at one point, why doesn't CMU have enough money now? CMU was out $1.2 million. They turned, Mr. Borges then conducted an audit. And it turned out, and it's recited actually in the briefs of counsel for Mr. Borges. It said, Cowick and Grayson diverted the funds that plaintiff invested. So those are the evidence that obviously the Governor's accepted the money only to be used for the project because it was diverted. That was $1.3 million. All right. If you accept Mr. Gall's position that Mr. Borges is going to have about $2.25 returned to him, you add the money that was diverted, you still have a shortfall. And that's the question, Your Honor, and you're exactly right. And here's how that works. How does the shortfall work? He receives $1.25 or whatever the number is out of the distribution. $1.35. $2.25. $2.25, I'm sorry, Your Honor. $1.35 at least is diverted. That brings us up to somewhere around $3.5 million. The rest of it, Your Honor, is spent on litigation costs in the arbitration. And that's the American rule, and we discussed that in the brief. In a roundabout way, what he is requesting, Governor's brought this action essentially for him, and he's sharing in the arbitration. But he wasn't a named party after our Borges won in the arbitration. He wasn't part of that at all. Good question, Your Honor. Very good question. But the fact is, then he could say, out of the distribution of the arbitration, I don't want the money. The fact is, Your Honor, he accepted the money from the arbitration. In essence, Governor's went to bat for him there, brought the money back to him, which he is accepting his portion. So the only reason for the shortfall are two purposes. One, a diversion that they themselves plead existed, that Mr. Borges testified to in quite detail of the diversion, and they themselves in their brief say, Howing and Grayson diverted the funds that plaintiff had invested. So the shortfall is just two parts. Whether there's other diversions, probably there are. More than $1.35, actually, Your Honor. But the ones that are in this case have proven facts under the testimony and the stipulations. The other stipulation is simply this. Mr. Howing and Mr. Grayson diverted the $1.35 million without authorization of the Governor's Board of Directions. That's a stipulation that Mr. Gall and I worked out together. So the fact is, Your Honor, if there is a shortfall, and I know we're lawyers and you guys are obviously much better lawyers than I, but the issue becomes proximate cause. How can we be the proximate cause of that diversion? I submit we can't be, and I submit that's not the law. And I know this panel is very learned on the subject of proximate cause. I've gotten to read some of the good-studied opinions recently in the McCabe case, the Berkeley case that you authored, Your Honor, and in the recent case of PNC. And they all resound with the same concept. Proximate cause must be looked at much more strictly. For instance, if I cut down a tree and I close a road, and it was negligent that I did, four miles later somebody has to go on a different road and gets in an automobile accident because someone runs a red light, I may be the but-for cause. But I don't believe I'm the proximate cause. And following Third Circuit precedent, I think I have some solace that I'm probably not, and I'm probably the kind of person who would cut down a tree and make it fall on the road. Well, your observatory brings up a more sophisticated argument that representations were made directly to him, to his client. How do you respond to that? They say that these representations that my client, aside from anybody else heard, is a substantial factor in causing our loss, plaintiff's loss. How do you respond to that argument? Good question, Judge Figueres. I think I respond that that's a different issue than the issue of damage as an approximate cause of the damage. It remains, the fact remains, we returned all his money. So even if you take, as Judge Schwab did, he said, you're the bad guys, you misrepresented. I'm taking all those facts to be true, as he should. But he's saying, and that's what Paul's gripe is about and Andrew's is about, there becomes a point, and they use the word arbitrarily, that arbitrarily the court says, enough's enough, we don't extend it back. In between our action of allegedly making a misrepresentation, there's something else that happened. A diversion of his money that they have stipulated to and admitted to. That's the proximate cause. We may be but for, that's the proximate cause. Secondly, the American rule applies with respect to litigation costs. That's the other part of their damages. That's our case. We think it's right. We know Judge Schwab's opinion. It's 24 pages. In other words, if this case were brought in court and you never went to the arbitrator, they'd still be out the million in legal fees and they can't assess that on you because of the American rule. Judge Hardeman, I wish I could have said it so well. Maybe that's how I should have said it. Yes. That's my presentation. But that's not how it was brought. Pardon me? That's not how this case got here. Well, Your Honor. You don't dispute that the plaintiffs have a direct and independent cause of action. Absolutely not. Against CMU. That's another one we lost, Your Honor. We had brought a standing motion. Right. And Judge Sensenex ruled against us on that issue. So based on that ruling, and you're not disputing it at this stage, they have the right to bring the action. And that's what Judge Schwab specifically said. So we're down to the question of whether or not the misrepresentations made by CMU was the proximate cause of their loss. That's correct, Your Honor. And it's our firm position that the opinion of Judge Schwab is correct on the issue and that that's been the foundation of court law in this country since Paul's first year of law school. Isn't this really a question of they're only entitled to one satisfaction? Aren't you ahead of the point of what you should be arguing? I could be, Your Honor. If they can prove that the misrepresentations by CMU caused them to invest $5 million and they're entitled to that $5 million plus any other damages, isn't really the issue as to what funds they're paid out of? And they're only entitled to get the $5 million back once. That's correct, Your Honor. And that's exactly how Judge Schwab put it. He even put it maybe in a slightly different way. But I mean, I just wonder if Judge Schwab maybe didn't jump a step ahead of where this case is. Well, not after the arbitration award occurred and the distribution occurred and Mr. Borges accepted money under the arbitration. Yeah, but he didn't get the – I take it – well, that's not part of the record, but okay, I understand your point. Thank you. Thank you. Anything else? Mr. Gold, do you have anything on rubato? Thank you, Your Honor. Let me make a couple of very brief points here. As Your Honor indicated, the notion that this was some kind of special pot of money and that that pot of money was returned as a result of the arbitration is wrong. Mr. Borges and his company were merely stockholders. As this Court recognized in Juarez 1, it is certainly true that the purpose he bought the stock for was to infuse money in governors to develop this supposed technology, but he was just a stockholder. There was no earmarking. There was no designation, no sort of constructive trust, no agreement. There is nothing in the record that would have allowed him as a shareholder to stand in front of the line of the other shareholders of governors and pull his $5 million out first. He was simply receiving as a shareholder his pro rata distribution. His injury was caused by the misrepresentations that Carnegie Mellon made, not by any diversion. And by the way, there is no evidence in the record that there was such a diversion. The stipulation to which my colleague and friend Mr. Yokaitis refers says that Mr. Borges acknowledges that he had been told there was a diversion. Let me ask you a question, Mr. Gold. If this case had been brought in federal court and an award was entered for the full value of your client's investment, but instead of getting $5 million, governors chose to send him a check for $3,500,000, would you have a cause of action against CMU for the balance of the $1.5 million? Absolutely. You would? My client. Why wouldn't you have a cause of action against governors for breach of contract or a variety of other corporate malfeasance for failing to turn over the full value of the judgment? I apologize, Your Honor. I misunderstood your question. Certainly, if governors had received an award that was large enough to pay off net all of the shareholders pro rata and Mr. Borges and manipulated the results somehow so that Mr. Borges didn't get what he was entitled to, then my client's cause of action would be, then there would be an argument that his damages would be diminished. Well, forget manipulation. What if it's a $5 million award and they send your client a check for $4 million with a cover letter that says, We won the case. We're very happy about it. Here's your check for $4 million. We know that you invested $5 million, but we spent $1 million on legal fees. Hence, you're out $1 million. Would you have a cause of action for $1 million against CMU? Absolutely, Your Honor. Isn't that an end run around the American rule? No, sir. The fee award, we're not claiming a recovery of attorney's fees here. Plaintiff's appellants are not seeking to recoup the attorney's fees that governors spent to get the award it got. The consequence of the fact that the Carnegie Mellon made governors spend $2.5 million to get the award is that it diminished the amount that was available for the prorated distribution to the shareholders. The shareholders only get the net. Governors had to spend the money to get the award. That's the principal reason why Mr. Buarez is short here. Governors had to go through the excruciating law. That happens in any case, any tort case, any breach of contract case. I mean, it's just from your perspective, I guess you could say it's an evil inherent in the system because the injured party has to go to all the time, all the effort, bring a case, try the case, win the case, and you're still not made whole because you incur all these legal fees. Yes, Your Honor, but there are two different injuries and two different damages going on here. The legal fees that Mr. Buarez has incurred are my legal fees, and those are the fees that he has spent to get the damage claims that he has to court, to this court now. Those legal fees, we're not seeking reimbursement of those legal fees in this proceeding, and we wouldn't be entitled to unless we obtain a damage award for an intentional tort or fraud. We wouldn't be entitled to that. We're not seeking a recovery of our fees. The fact that governors had to spend money, that had nothing to do with the fee award. Governors did not obtain a fee award. That simply reduced the net. It was a legitimate corporate expense, and it reduced the net available to the shareholders. The shortfall, that doesn't deal with the question of who's responsible for the shortfall. Judge Schwab defined proximate cause in a way that made it impossible for us to meet the burden. He said, you've got to have a different cause than the misrepresentations that were made to you because those misrepresentations will only support one injury and one damage claim. And in this case, the representations injured two people in two different ways and support two entirely separate damage claims. Entirely separate. We respectfully request that the court reverse the decision of the district court and send the matter back to the court of proceedings. Thank you, Mr. Goll. We thank both parties for excellent arguments, and we will take the matter under advisement.